I think we have ample time to put your arguments out there. We won't hurry. So with that, Mr. Williams, why don't you begin anew? Thank you, Your Honor, and may it please the court. Chadwick Fulks is intellectually disabled. His execution is prohibited by the Eighth Amendment. Now, the lower court that denied Mr. Fulks an evidentiary hearing on the merits of his ID claim concluded that Mr. Fulks proffered extensive evidence of both his intellectual disability and the fetal alcohol spectrum disorder and brain damage that caused the intellectual disability. Now, if the lower court's ruling is upheld, if the 2241 court's ruling is upheld, then the way will be clear for the federal government to execute a person with intellectual disability who could never have litigated his Atkins claim in any proceedings under 2255. May I stop you for a moment, because this is a question that I've been mulling over. The existence of More 1 and More 2 appear to demonstrate that an Atkins claim is available to a petitioner, even when circuit law is unfavorable. What I have been wondering is why could Fulks not bring an Atkins claim in a section 2255 petition and then appeal to the Supreme Court if the Fourth Circuit failed to properly apply Atkins? You see, it seems that that route was open to More. I mean, that's how More obtained relief. Where would I be wrong if that's what I was thinking? Your Honor, the difference between Mr. More's scenario and this scenario is one of these aspects that makes Mr. Fulks' situation so very specific and unique and rare. And that is, at the time of Mr. Fulks' initial 2255 proceedings, based on diagnostic standards at that time, the experts who assessed him did not diagnose him as being intellectually disabled. And so they opined that he was very close, he was on the cusp, but he was a few IQ points shy of actually being within the diagnosis. And being diagnosed as intellectually disabled is a necessary predicate for filing an Atkins claim. And absent that diagnosis, Mr. Fulks' 2255 counsel could not file an ID claim or an Atkins claim and proceed in the way, Judge Roedner, that you outlined. So regardless of the precedent that the Fourth Circuit employed at that time, an Atkins claim was still not something that Mr. Fulks could proceed on. And that's one of the significant developments that renders Mr. Fulks' case a case where 2241 review was appropriate. That at that time, diligent counsel couldn't proceed because the experts that they consulted with and retained had said he's very, very close, but he's not ID under the diagnostic standards in place at that time. And now, new diagnostic standards have been issued, and the scientific community knows a lot more about IQ testing and its inherent unreliabilities. And under current diagnostic standards, Mr. Fulks has been diagnosed as intellectually disabled and now can proceed on the claim. And this leads us into a significant structural defect in 2255H, which governs successive 2255 motions. That 2255H does not contain a place, a provision, for petitioners such as Mr. Fulks who have been rendered ineligible for execution based on factual developments such as the issuance of new diagnostic standards and diagnostic advances. That 2255H only allows for factual developments to justify a successive 2255 motion if those developments go to innocence of the crime. And that's not what an Atkins claim is. It's a claim that the defendant is ineligible for execution, that there is a substantive restriction on the government's power to take the life of a defendant with ID, and that proceeding on that execution would violate that substantive restriction. So that's why, and that's the constitutionally intendable position that Mr. Fulks... punishment or execution in the debate in Herrera against Collins that I assume we're all familiar with. And we see in the debate in Herrera and later cases among judges and justices who are willing to accept the notion that actual innocence is a bar, that there's a very serious question about how much has to be shown to reopen a case after a direct appeal after 2255. What we see in 2255H1 on actual factual innocence of the crime is a very high stand, clear and convincing, new clear and convincing evidence such that no reasonable fact finder would have found the defendant guilty. Do you think the standard is less demanding for this kind of Atkins claim based, as you say, on new diagnostic standards? Well, and Your Honor, my initial inclination would be to say that, you know, that it is less demanding because this claim clearly doesn't fit into 2255H. But I would also say, and obviously this is not an issue that's come up in the briefs. I don't understand the reasoning of that last conclusion, but go ahead and finish. Well, I don't want to get caught up on that, Judge Hamilton, because the other piece is that I don't think this court has to decide that issue. Because what the 2241 court found below was that no factual developments that didn't specifically match the facts and circumstances of Webster would justify a 2241 review in an Atkins claim such as Mr. Folks'. So I don't think we have to get to burden of proof at this point because we have proffered specific evidence that Mr. Folks'. By comparison, compare Mr. Herrera's evidence that he was actually innocent, where he came forward with, if I recall correctly, four affidavits from people who offered evidence that conflicted with the jury's verdict. That was not enough. The court has, and our court as well, we're used to seeing last minute efforts to bring in new evidence. And it takes a pretty substantial showing to open the courthouse door at this point. I don't see how we avoid that question. And Your Honor, I would submit that the 2241 court found that the showing we had made, the evidence we had proffered, was extensive, and it is. Well, if we count pages, it is, yes. But it adds up to, if he's intellectually disabled, it's just barely. Well, and Your Honor, I would respectfully disagree with the characterization of just barely. That we're dealing with a situation where on prong one, the issue is how do we properly interpret IQ testing? And that doesn't address the quantum of evidence that has been proffered in support of Mr. Folks' claim of intellectual disability as a whole. And the point of the new diagnostic developments is not that Mr. Folks is just barely ID. You're either ID or you're not. But that we have been interpreting IQ tests improperly. And that the quantum of evidence that already existed in this case was significant and extensive as to Mr. Folks' intellectual disability. For example, his adaptive deficits that have been present throughout his life. He failed the first grade, was given extensive special education supports after that, and continued to have them throughout his school career and still failed. Failed to successfully complete the seventh, eighth, and ninth grades before ultimately dropping out. He was consistently described by collateral reporters as being slow to learn, hard to teach, gullible. And that's in all areas, not just in school, inside and outside of school. The testing evidence of Mr. Folks' adaptive deficits and his intellectual deficits and cognitive deficits, I would also submit as extensive. That we can see pictures of his brain where there are holes where his brain has failed to develop. The problem, Mr. Williams, is that we know that there are deficits, we know there's brain damage, and it's a question of degree. I believe Judge Anderson described the trial defense team as the dream team for capital defense with Mr. Bloom, Professor Johnson, and company. And so, what I'm struggling with here is, does this really come down to trying to evaluate where the Flynn effect and the practice effect for IQ tests stand with respect to DSM 4 to 5 and AAI, AI, sorry, AAIDD 10 to 11? And, Your Honor, that's one factor. The other factor is the acknowledgement in the AAIDD's 2012 user's guide that we no longer, and the DSM 5, that we no longer rule in or rule out ID based on a difference of a couple of IQ points. But the larger point that I'm trying to make here, Your Honor, is that these are all factual issues. Whether or not Mr. Foulkes' ID is a factual issue that requires an evidentiary. I understand that. Yes. But the problem is, this case is old, it's been litigated, you know, what was it, 33 claims in the 2255 petition, and the question is, what does it take, in your view, to open the door one more time? And, Your Honor, I think our point is that, in my view, whatever standard is applied, we've met it. That's very helpful. Well, I think that if the court, I think that because there is no specific provision addressing or setting the same standard at 2255H, you know, I would suggest that the standard along the lines of in Webster, that you have to factually proffer that these are the circumstances. And then you should be permitted to present an evidentiary presentation to prove up what you've proffered. But even under, if we took 2255H's evidentiary standard and applied it to this case, we would have met it. And that's why I don't think this court has to decide. And no reasonable person could disagree on this issue? No, Your Honor, because the only thing that was keeping Mr. Foulkes out was a couple of points in terms of his IQ testing that all of the experts who had assessed him previously, experts who testified at trial and experts who testified or submitted affidavits at 2255 proceedings. They found that he was very, very close, right on the cusp, but just a little bit too high based on his IQ testing. And so the issue is... Mr. Williams, I'm sorry, finish your answer. I just want to have a follow up on that line, but please finish your answer. Okay. So it's not like there's this large swing that the experts previously were very clear on what the difference would be. And the diagnostic manuals developed in a very, very specific way so that that difference no longer excludes Mr. Foulkes from a diagnosis of intellectual disability. So I think that's why we've met it under any standards, certainly in the absence of an evidentiary hearing. So the question I have, Mr. Williams, for you is, as you work your way through that menu of evidence, if you will, or the factual proffer, I have a very hard time seeing how that... Early on in response to Judge Rovner's question, how was somebody so very close, as you argue, still did not raise an Atkins claim? Because you can say, look, there's a lot of literature, a lot of clinical standards out there that set the cutoff slightly above where he's at. But I just find it hard to believe that he could not have brought forward somebody to opine that he nonetheless was suffering from intellectual disability. And I benefit from your reaction to that comment with one other thought that has run through my mind in preparing for this. I don't know that I read the changes from 4 to 5 or 11 to 12 as being as monumental and as kind of pathbreaking on the clinical front as you argue they are. So I benefit from hearing you respond to both those points. Yes, Your Honor. And Judge Scudder, as to the first point, regardless of how close he was, he actually has to be diagnosed as ID. And trial counsel presented three mental health experts, all of whom said close but not quite ID. 2255 counsel presented three additional experts, all of whom said very, very close but not quite ID. And so those are six experts in total. It's difficult to think of what more diligent counsel could have done. That if we change the setting to the context of ineffective assistance of counsel, if a trial lawyer consulted with six experts and all of them said he's very, very close for this very specific reason, and he's not intellectually disabled, then I don't think we can fault trial counsel, or in this case 2255 counsel, for a failure to present an Atkins claim. I think the threshold here is what would diligent counsel have done in a net consultation with six mental health experts. Wherever we set the bar of diligence, that's past it, Judge Scudder. As to the second issue, I would submit that there are two aspects of this relating to the interpretation of IQ testing. The first aspect is correction for the Flynn effect and the consensus that formed around that. And in many cases, and I would postulate in the vast majority of ID cases, that's not monumental. But in a case such as Mr. Folks' where he is so very close and only a couple of points over what was at that time the diagnostically appropriate cutoff, that's a monumental change. It's a testament to the breadth of his impairments that the only thing that was keeping him out was those few points. And I would say the same thing about the DSM-5's emphasis on the clinical assessment of intellectual functioning, and the AAIDD's user's guide from 2012's statement that ID is not an actuarial determination, it is fundamentally a clinical assessment, as going to the same point, that a couple of points under current diagnostic standards don't rule someone out of being intellectually disabled. We go from 70 to plus or minus 5 takes us to 75. And if you're within a couple of points, you're 77. But if you're not 79, well, you're only a couple of points above that level. So how far does that line of logic take us? Well, and Your Honor, we don't have to, the court doesn't have to make that choice now. Because this case is a case where he was a non-Flynn-corrected 77, and that Flynn-corrects down to 75. And then he received essentially the same score two more times within a year. Well, that, okay, that relies on the practice effect. To follow up, can you repeat, repeatedly say in your brief that Flynn effect adjustments are required? Can you direct us to the pages in DSM-5 or AAIDD 11 that require it? Yes, Your Honor, and by AAIDD 11, is the court referring to the Green Book? Because I believe we've cited those pages. I don't have the appendix sites in front of me, but I believe we've cited those pages, and the government certainly has in its response. I've looked at them, and I don't, the reason I'm asking is I don't see a requirement. I see discussion in the previous versions about the Flynn effect, and discussion about thinking about these issues. I don't see a mandate. Well, I think the language in the AAIDD's 2012 user's guide is that a Flynn correction is warranted. And I think the language in the AAIDD's 2015 intellectual disability and the death penalty manual, we attach that chapter to our reply in the appendix to the reply, which indicated that there is a scientific consensus on the fact that that correction for the Flynn effect should be done in capital cases, in cases where there's an artificial emphasis on an IQ cutoff. So it's there. The language in the user's guide is warranted. The language in the AAIDD's 2015 manual is there is a scientific consensus that has coalesced on this issue. And that's precisely our point, that the scientific consensus has emerged since Mr. Folks' 2008 2255 motion was filed. And that creates this. The other thing that I would add is that this is fundamentally a dispute that needs to be hashed out at an evidentiary hearing, and that we would enjoy presenting testimony on, because the appropriateness of Flynn correction is a factual dispute relating to diagnostic manuals and appropriate diagnostic practice. And that's something that we've been denied the opportunity to litigate, that the 2241 court didn't make rulings on Flynn correction. The 2241 court said no diagnostic developments can justify a savings clause review in an Atkins case. And I would submit that that ruling is far too extreme, and precludes us from making the cases that should be made in an evidentiary hearing with expert witnesses on the stand. Testimony is presented. I'm sorry. Go ahead. Hugh, you know, is arguing that he's objecting to the execution of his death sentence, rather than the imposition. Now, does that mean that if the medical standards change again, but in a manner that is unfavorable to his claim of intellectual disability, the government would need to lift a stay and proceed with his execution? Well, and Your Honor, depending on what those developments are, and depending on how those developments would impact the diagnosis of intellectual disability, you know, potentially that could happen. But that's not the scenario that's present here. The scenario that's present here is that he was very close at his initial 2255 proceedings and excluded by a couple of IQ points. Science on the interpretation of IQ tests, including correction for the Flynn effect, has advanced significantly, which is just what Moore one envisioned. Moore one said that current diagnostic standards reflect, quote, improved understanding over time. And so what we've seen here is understanding of Flynn correction has improved over time. And our argument, our objection to the, I mean, we have a number of objections, but one of our objections to the 2250 or 2241 Carts ruling is that it imposed, you know, a ban on reliance on diagnostic developments. How do we, I know what you've argued in your brief. I've read it carefully, but I have a hard time seeing how what you're urging in your argument wouldn't require us to overrule our decision from last October in Bourgeois. The distinctions you make, it's statutory versus constitutional. I have a hard time buying them. I mean, Bourgeois contains a quite extensive discussion of Eighth Amendment jurisprudence. And it's pretty clear to me that that case is resting on an Eighth Amendment pillar in part. And your honor, I don't. I think that's also another issue that the court doesn't have to reach because we're gone. Alfred Bourgeois wanted to advance the same argument. It's a different argument. And if I could explain why it's related. Please do. But I think the distinction that precedes the constitutional versus statutory issue is that Alfred Bourgeois, the Bourgeois opinion was hinged on the fact that Mr. Bourgeois had an extensive evidentiary hearing in 2255 proceedings, that the 2255 court issued a 100-page opinion that addressed the ID claim in detail in a way that this court found fundamentally sound. It hinged on the fact that I'm paraphrasing here, he could and did litigate his ID claim in 2255 proceedings. My reaction to that is that what the panel is saying to my there in part is that diligence matters in habeas. And when faced with a close call about whether to advance a claim, advance the claim. Now, even there, the court wasn't willing to allow him to bring it again or bring it anew or to refresh it under 2241. But Mr. Foulkes never, he never raised it in the first place. He never raised his claim. And it just, it's a very odd scenario to say, well, it was close, but it wasn't quite there. And so we passed on it. He passed on the claim. And that's not often what happens with habeas defendants. And I think the point that I'm making is that counsel didn't pass on the claim. They didn't have a factual basis in which to make it. That in order to proceed on an ID claim, you need a diagnosis of intellectual disability. And they consulted with a net, if we count trial and 2255, six experts, all of whom said he was very, very close, but not quite there. And that is reflected in their testimony. And the advancements that underpin his diagnosis of ID now are laid out clearly in our papers and the diagnostic manuals. So it's not a question of counsel not being diligent. They were diligent. They did everything they could reasonably do, but they didn't have a diagnosis, so they couldn't proceed. And that's precisely how Mr. Foulkes' case, before we even get to the constitutional versus statutory issue, that's precisely how Mr. Foulkes' case is different from Mr. Bourgeois'. That Mr. Foulkes is in a position where counsel were formally prevented from proceeding on an ID claim because they didn't have a diagnosis to present. They didn't have an ID diagnosis to present. And Mr. Bourgeois presented his ID claim. And that was what the Bourgeois court found to be sufficient, that he could and did present his claim under Atkins and the FDPA. Let's pretend that he did bring it. Do you think he would have been sanctioned by the court for bringing it? What do you think the upshot would have been there? Well, I think his counsel would have had a lot of explaining to do to the 2255 judge. And I think if they filed an Atkins claim with expert reports that said he's not intellectually disabled, at a minimum, it would just be denied out of hand, denied without a hearing. And they would, as I said, have had some explaining to do as to what they were doing filing the claim. And your honors, I see that I have a minute 50 left. If unless there's a question, I would like to reserve what I have left for rebuttal. With my colleagues patience and in light of what Judge Scudder at the beginning, I'd like to follow up on a couple of things. First of all, do you stand by the assertion in your brief that you think the bourgeois panel just forgot about the constitutional issue? No, your honor, I don't think they forgot about it. I think they took a statutory analysis and they applied the statutory analysis to the constitutional issue in Mr. Bourgeois. They clearly said we're addressing both, but they also said the analyses apply. You thought we forgot about the Constitution, though, in doing that analysis? No, your honor. And obviously, Judge Hamilton, I know that you were on the bourgeois panel. I think that what this court did is it didn't address the constitutional analysis and how it was different and that we were raising a fundamental constitutional claim or Mr. Bourgeois was raising a fundamental constitutional claim and didn't address the defect that Webster flagged. And that is present in Mr. Folks's case. That's why it doesn't apply here. Okay. So if I understand this correctly, during the briefing on this case, the AAIDD issued a new 12th edition. Regardless of if we could affirm here, we could send this back for factual findings in the district court. However, that turns out, in your view, could Mr. Folks then bring a new 2241 claim based on the 12th manual? And your honor, no. And that demonstrates why this one development was so specific. The diagnostic developments are based on the fact that it makes his Atkins claim available in such a way that it wasn't available before and that the changes in diagnostic manuals were material. We didn't file anything additional before this court on the new 12th edition because there was no change in that manual that was material to Mr. Folks's claim. It's an element of our claim that it would have made a difference before and after. And we've laid out clearly why it would have made a difference. And the 12th edition, the changes that are contained in that manual don't make a difference. And so there's been an argument that was raised by the 2241 court or a line of reasoning that you'd see new claims with every new manual. And I would submit that that's not the case. And this new manual, the issuance of the 12th edition, illustrates that. That it has to be material. It has to matter. And the developments in the 12th manual aren't material to Mr. Folks's case. They don't affect his claim. So there's no new filing, no change and no additional litigation on that. OK, very well, Mr. Williams, you reserved originally five minutes for rebuttal. I'm inclined to give you that time. We may spend some extra time with Mr. Glazer here. So you're going to have some rebuttal time. And with that, why don't we turn to Mr. Glazer, hear his argument. Thank you. May it please the court. William Glazer on behalf of Warden T.J. Watson. Folks can't show that his Section 2255 remedy was inadequate or ineffective to test the legality of his detention. Because no structural defect in Section 2255 itself prevented him from raising an Atkins claim in 2008 at the time of his 2255 motion. Mr. Glazer, the Fourth Circuit law was firmly against Folks. At what point in time did he have his one fair opportunity to raise the claim that he raises now? Your Honor, we would first of all dispute the view that the Fourth Circuit law was against him. But I think this court's decision in Bourgeois, which is really both the starting and ending point of the court's decision here, addressed that very issue of where the circuit law might foreclose a claim. And in Bourgeois, the court noted that Mr. Bourgeois suggests, quote, that binding Fifth Circuit precedent prevented the court from properly analyzing his adaptive deficits. This court said, but even if that were true, it does not demonstrate that it was impossible for Bourgeois, armed with Atkins in the latest clinical diagnostic standards, to demonstrate that he was intellectually disabled. So I think this court has already settled that issue, that even if the law was against him, and we dispute that it was, but even if it was against him, he was not prevented from raising a Section 2255 claim. The most that could be said is that his claim would not have succeeded. And as this court made clear in Perki, and again reiterated in Bourgeois, the fact that a claim might not be acceptable, the proper use of the statute results in a denial of relief, does not mean that Section 2255 is inadequate or ineffective to test the legality of the distinction. You know, on page 38 of the government's brief, the government seemed to concede that the Fourth Circuit sometimes incorrectly relied on adaptive strengths in rejecting a claim of intellectual disability. If Circuit Law was against him, and incorrectly so, then do you still maintain that Section 2255 was available to him? Yes, Your Honor, we do maintain that. And the reason is that this court's decisions have made clear that there has to be a structural defect in the statute itself, not simply in the law of whatever the applicable circuit is. But I'm happy to address the Fourth Circuit law as well. And as we point out in our brief, the first case that he relies on, that we address on page 38, well, actually, so three of the cases that he relies upon were decided after he filed a Section 2255 motion. And so they certainly couldn't have precluded the motion at the time. But even the decisions that he does cite, and specifically, as you mentioned, those that looked to adaptive strengths, I think that a fair reading of all of those decisions shows that the Fourth Circuit was not considering unrelated adaptive strengths, as the Supreme Court said in Moore was inappropriate, but instead was looking at evidence that directly rebutted the asserted adaptive deficits. And so I think that those decisions were actually correctly decided. But even if they weren't, this court's decision in bourgeois indicates that circuit precedent, adverse circuit precedent is not enough to allow resort to the saving clause. Now, Mr. Williams attempts to distinguish a bourgeois. Can I pause you for a second, you can keep your thought in mind, you can return to it. I got I got a question for you. One case it's it's not talked about in the briefing, I don't know if you're familiar with it or not, is from the Fourth Circuit in 2004. It's called United States versus Rowan, R-O-A-N-E. And your honor, I'm not I'm not familiar with that case. Okay, it's a case that comes out of Eastern Virginia. And in taking a look at the state of the Fourth Circuit law, around the time of the petition here and in the in the time before it, the district court in Rowan found that a professional association had determined that an IQ of 75 or below places someone in an ID category. They were using the other the older language, but in an ID category. And I thought I thought Rowan possibly combined with the argument that Judge Gregory set out in a separate opinion and Kelly. And indicated that that the law was not. I think it was it was definitely unfavorable. To Mr. Folks, but I'm not sure I read it as foreclosing his claim. In other words, I don't know that we're dealing with a situation where we could say that an ID claim. No included in the 2255 petition would have been futile that the law was effectively telling Mr. Folks, you're wasting your time. Your honor, I don't think that this court is it's mainly Rowan in the in the second in the in the separate opinion and Kelly that that left me with that view. Well, your honor, and I apologize for not being familiar with and able to discuss that case. I attempted to address the cases that Mr. Folks relied upon in his brief. But I think, again, because of this court's decision in Bourgeois, this court doesn't need to get into the exact contours of Fourth Circuit law at the time. Because, again, Bourgeois said that even assuming it were true that a claim would not have succeeded in that case in the Fifth Circuit at the time. But then I didn't want to be about that, though. Here's here's what troubles me about it. OK, suppose, for example, create a different case for a second. Suppose we have a defendant with multiple IQ scores in the 71 72 range with other indications of serious limitations and intellectual and adaptive functioning. And that that gentleman advances his acting claim, Adkins claim and doesn't prevail on the basis of effectively what you just called a whole error. You know what I mean? Yes. Why can't that defendant access the savings clause in light of the changes in the in the clinical standards? He did everything he was supposed to do. Right. And the DSM four to five, 10 to 11, those those changes may be quite material to somebody. And so you'd say he shut down. It's foreclosed. He can't bring it. How do you how would you defend a result like that on those facts? So, Your Honor, I think in the context of the saving clause, the response is that were he to bring such a claim and were that claim to fail in the district court, he could seek he could appeal and then he could seek certiorari from the Supreme Court. And so I think, again, well, sure, sure. And they affirm and then comes and then comes Hall and then comes more one and then comes more to you see where I'm going with that. Yes. So, Your Honor, I understand that that the result seems harsh. But Section 20 to 55, the saving clause strikes. Congress strikes a balance in favor of finality at a certain point and has concluded that after a certain point, when you've had a full and fair opportunity to litigate an Atkins claim in Mr. trial and on collateral review under Section 20 to 55, if he had so chosen, that at a certain point, there's nothing further that a defendant is entitled to in order to raise such claims. And how do you respond to Mr. Williams saying he tried there? He went to the professional community. They examined him to clinically determined he did not suffer from an intellectual disability. So, Your Honor, we certainly don't dispute that he was unable to find any experts at any prior time before 2019 that diagnosed him with an intellectual disability. And the reasons why are are difficult to discern, certainly from this record. The government in its response to his 20 to 41 motion obviously reserved the right to contest his contention that he is intellectually disabled. But the government has not examined him with any of its own experts or sought to address the sort of substantive Atkins issue, but instead relied on the procedural bar of the saving clause. But I don't think even then the fact that he was unable to find an expert is sufficient. And here's the reason why. In in Perkey, this court addressed a claim that 20 to 55 counsel was ineffective for failing to raise counsel's ineffectiveness at the trial. And there were there were some some concerning claims of in effect trial and effective assistance that were that arose in Perkey. This court was concerned by them, but still concluded that that 20 to 55 counsel's ineffectiveness and possibly the underlying ineffectiveness of trial counsel was not enough to allow resort to the saving clause. So I think similarly here we effectively the claim would be, well, my trial counsel should have kept kept looking for another expert or my trial counsel should have waited until there were further diagnostic developments. But this court in Bourgeois made clear that that these these sort of updates to the manual are not enough to allow resort to the saving clause. So I understand that that his position is, well, I didn't have a an intellectual disability claim until 2019. The government disputes disputes that he is even now intellectually disabled. But Bourgeois also established that intellectual disability is is a is a constant thing. It's not something that just changes. And so, again, in light of Bourgeois, the changes in the diagnostic manuals, even if they might affect the analysis to some degree, even if they might make it so that you could somehow find some expert somewhere that would that would diagnose him with intellectual disability, doesn't excuse his failure to raise it earlier and allow him to say that there's actually a structural problem with the statute itself here. The problem, to the extent one exists, is a problem of the development of the diagnostic manuals and his counsel's ability at prior stages to obtain experts who would diagnose him in a certain way. The problem is not one with the statute 2255A itself in that that statute was was on the books. Atkins was on the books at the time of trial and at the time of his initial collateral review. And again, this court's decisions make clear that there needs to be a fundamental defect in the statute itself, not simply sort of a factual problem that makes it difficult for a defendant to obtain relief. That was perhaps a long answer, but if I can, as I was beginning to address Mr. Williams attempts to distinguish Bourgeois, because, again, Bourgeois makes makes the outcome in this case pretty clear. He first points out that Bourgeois, the defendant in Bourgeois, was able to actually litigate his Atkins claim in the district court in Texas. And again, I don't think that that distinction helps him. And that's for a couple of reasons. First of all, the defendant in Perkey could have similarly asserted that he did that no court had considered his claims of ineffective assistance of counsel. And in Perkey, this court didn't conclude that that would somehow be enough. Similarly, in in Bourgeois, he asserted Mr. Bourgeois asserted that no court had ever reviewed his claim in accordance with clinical diagnostic standards. That's the way that this court characterized it. So, again, he's saying no court has ever properly considered my Atkins claim. And still, this court said that is not enough. Now, the court did, of course, say that it disagreed with Mr. Bourgeois and thought that the district court in Texas had done a pretty good job. But at the same time, this court in Bourgeois said that it really didn't matter. It did not matter whether or not he was intellectually disabled. But all that mattered is whether or not he was deprived of the ability to bring a Section 2255 claim. So I think those distinctions don't help him. And a final distinction is that it would be an odd situation in which this court would say that a defendant who failed to raise an Atkins claim at any prior time should somehow be put in a better position than someone like Bourgeois, who did litigate his claim. It turned out that Bourgeois couldn't prevail under the then existing standards. But to say that a claim that Mr. Polk should be put in a better position than Mr. Bourgeois would not make a lot of sense. I think I'm going to turn to the second. Go ahead. Well, Mr. Glasser, I'd like you to go back to the Herrera against Collins parallel that I was trying to draw from the opening argument and ask you, in part, can you imagine new legal or factual developments that would make relief available under 2241 with respect to an Atkins claim? I know you all don't like Webster, but that's the law of the circuit. Can you imagine such developments? And what standard do you think we should apply to decide whether the door is open? So, Your Honor, in answer to the first part of your question, I certainly can imagine something that would satisfy Webster's standard. So that would be a newly discovered evidence that was unavailable at the time of trial through no fault of trial counsel. So that would be one instance, I think. And this is this is actually important. I think the other situation in which I could imagine new factual and legal developments would be things that would be that would fall under Section 2255H, which authorizes successive motions in certain situations. So, in other words, let's say that we have Atkins itself comes down. This court has concluded that Atkins itself was a retroactive decision. And so Atkins itself would be a new legal development that would satisfy Section 2255H. There are new claims of innocence based upon newly discovered evidence. Those would also fall within Section 2255H. So I think the universe of claims that would come up within the saving clause based on new factual legal developments are small. And in fact, this court's decision in Webster indicates that they are intentionally small because Webster recognized that there could not be a new claim under 2241 for every new legal development. Excuse me, every new factual development. So the I guess the standard and the second part of your question, I think the standard is really been established already through Webster is a limited exception. This court's decisions in Perkey and Bourgeois indicate that Webster doesn't apply to this. Well, so Bourgeois addressed the specific new factual legal developments asserted here. That is, Bourgeois addressed the Supreme Court's decisions in Hall and the two more cases and addressed the updates to the diagnostic manuals and said that those specific claims don't don't pass. And so I think that the standard is really to not go beyond Webster. And the reason is that Webster, Davenport and Garza, this court's sort of triumvirate of saving clause cases, all involved very narrow and specific instances where Section 2255 itself was had a structural problem. This court in Davenport concluded that the problem there was that the defendant could not raise his his Bailey claim in a first 2255 because Bailey hadn't been decided and he couldn't raise it in a second or subsequent 2255 because Section 2255 H failed to account for legal innocence. And the similarly in Garza there, the defendant couldn't raise his claim under 2255 because he actually had to exhaust his 2255 remedies before he could obtain relief from the Inter-American Commission on Human Rights. And again, in Webster, the court concluded that Congress simply hadn't contemplated when it enacted 2255 H's limitations on second or successive relief had not contemplated the sort of categorical ineligibility for the death penalty that the Supreme Court recognized in Atkins. So I think those are narrow situations that aren't satisfied here. In a simplistic sort of nutshell way, I take it that your argument is that it doesn't matter if Mr. Folks had no claim initially but would have had one under the new standards. Because the claim was available, even if it was a loser. And in the end, it's all about finality. Your Honor, I think I would mostly agree with that. But if I can, I think one of the court's concerns here is understandably about fairness, right? Because he has... I would hope so. Right. And so I think maybe the best way to address this is to explain it this way. If Mr. Folks were raising a Ford claim, for example, a claim that he lacks rational understanding of the reasons for his execution, and he can bring some sort of new development that demonstrates a Ford claim, that is exactly the type of claim that he can raise at some... Based on subsequent developments, right? Because a Ford claim can come and go. But as this court recognized in Bourgeois, an Atkins claim is not something that... Intellectual disability does not come and go. It requires onset before the age of 18. And so you can't speak of someone who was not intellectually disabled in the past, but who is today. The court said that in Bourgeois. And so the kind of claim that he could bring here would need to be something... You would need to show a legal development sort of on par with Atkins. That is to say that there was a new type of disability that prevented him from being executed. And what we have here are simply some sort of minor clarifications by the Supreme Court and by the medical community as to the exact methods by which one diagnoses intellectual disability. And as this court said in Bourgeois, it cannot be the case that every time the Supreme Court clarifies the standard or the medical community updates its manuals, that a new Atkins claim arises. And so, again, if there were some sort of new legal developments on par with Atkins, or if it were some sort of... If his claim depended on something other than sort of a fixed category of the way that intellectual disability had to arise by the age of 18, then it might be different. But what we're talking about here is someone who, if he is correct, was intellectually disabled at the time of trial and at the time of his Section 2255 petition. And all he's saying is it was harder to get that diagnosis at that particular point. And this court has said in Bourgeois that's not enough. This may be getting at a similar question, Mr. Glasser, but given the procedural posture here where the 2241 petition was dismissed without a hearing, do you think we need to take Dr. Crown's opinion at face value and assume that the defendant currently meets standards for intellectual disability? No, Your Honor, I don't think that this court needs to... Well, okay, for purely legal purposes, yes, I think the court needs to assume that. In other words, our procedural view is that regardless of whether Dr. Crown is correct, Mr. Foulkes is not entitled to bring a 2241 claim based on the saving clause. But to be clear, we... Suppose I disagree with that in the abstract. And somewhere on this issue and closer to where a majority of the Supreme Court was on Herrera against Collins, namely that, at least in theory, this ought to be a viable... But what we've got to do is look at the showing that has been made to try to open up the courthouse door. Your Honor, I'm not sure if I'm fully understanding the question, but I think our legal position is that the saving clause bars relief, even assuming Dr. Crown's diagnosis is correct. I understand that. Obviously, I'm asking if you've got a fallback from that position. Well, so, I mean, our fallback for one thing, Your Honor, would be that we absolutely dispute Dr. Crown's diagnosis. But that's something that would require a hearing, an evidentiary hearing in the district court. The district court said that he produced substantial evidence in support of that claim, but by no means made a finding that he was intellectually disabled. And, again, the government reserved the right to dispute with its own experts, affidavits, and other evidence the claim that he is intellectually disabled. But, again, it doesn't really matter. And, again, this flows from Bourgeois, where the court said the question in this appeal is not whether Alfred Bourgeois is intellectually disabled. It is instead whether he was able to litigate his intellectual disability claim in his Section 255 motion. He was and did. And so I think our fallback position would be something that would be fought out in an evidentiary hearing in the district court. We certainly don't think that a single report from a single expert that's attached to his filing is enough sort of to conclusively establish and to support a district court's finding. But for purposes of this litigation, we didn't dispute that because we went on the procedural bar. Well, that's troubling because, as you say, Bourgeois was able to litigate. He did. And I understand your position that a single expert shouldn't be enough to conclude the issue. Is a single expert enough to force a hearing? I understand if you want to say no, but, again, I'm trying to draw on pre-EDPA guidance from the Supreme Court on what strikes me as a similar issue. Your Honor, I would say but for the saving clause, yes, a single expert's report would be enough to force a hearing. So if let's say we were not in saving clause land but in 20 to 55 land, then absolutely. Yeah, I agree with you. I agree. Then it would be enough to force a hearing. But an allegation, whether supported by a raft of evidence or none, the allegation itself at this point is barred by the saving clause because the Atkins claim is something that could have been brought both at the time of his 20 to 55 motion and at the time of trial. And if I could address, returning to his other attempt to distinguish Bourgeois from this case, he argues that Bourgeois did not address the Eighth Amendment claim, at least not the sort of core of the Eighth Amendment claim, in his view that it didn't address the problem that Webster mentioned of categorical ineligibility for the death penalty. But I think that that's exactly what this court did in Bourgeois when addressing the Atkins claim. It noted that his FDPA and Atkins claims were governed by the same standard. It said they were, quote, substantively identical. And it pointed out that Atkins was the, quote, watershed case on intellectual disability. So it recognized that Atkins, as Webster stated, that Atkins introduced a categorical bar to the death penalty, the execution of the death penalty. And this court specifically said Bourgeois is not eligible for savings clause relief on either his Atkins claim or his FDPA claim. So although the court didn't sort of dig further down into the exact nature of an Atkins claim, which seems to be his argument now on appeal that it didn't address the sort of big constitutional problem, I think that's inherent in the court's analysis itself. Atkins represents a big constitutional problem. It represents categorical ineligibility for the death penalty. So just because the court didn't address the exact sort of language that he's using now to stress the importance of the Atkins right doesn't mean that this court somehow didn't address Atkins in Bourgeois. And so there are certainly many questions that Mr. Foulkes attempts to raise in this case regarding the exact applicability of Fourth Circuit law and of the manuals at the time of his claims versus the manuals now. But we believe our briefs have explained why there hasn't been any material change in either the Supreme Court law or the diagnostic manuals. But at the end of the day, this court's decision here is dictated by Bourgeois. Mr. Foulkes hasn't suggested any reasons why this court should overturn Bourgeois. He asserts that it should be overturned, but this court already denied rehearing on Bonk and Bourgeois and the Supreme Court denied certiorari. And so at the end of the day, his claim is foreclosed by the saving clause for the reasons that this court explained in Bourgeois. And if the court has no further questions, I'm going to kill my time. OK, Mr. Glasser, very well. Thanks to you, Mr. Williams. We'll return to you for rebuttal. Thank you, Your Honor. And, Your Honor, I'd like to begin with the structural defect in 2255 and the defect is in 2255H. We've outlined a number of them, but I think the most most prescient one for this conversation is that 2255H has no room for factual developments such as the new diagnostic manuals that render someone intellectually disabled and ineligible for execution. The only way to file a successive 2255 motion based on factual developments is if those factual developments establish innocence of the crime, not ineligibility for execution. And in a case that involves a categorical exemption like Atkins, as this court identified in Webster, that's a problem. And the problem is that there's no way back for a defendant who is is is rendered ineligible by factual developments that the defendant who fits into that category. And it generally doesn't happen. And the cases where it does happen are very, very rare, like in Mr. Webster's case and in Mr. Folk's case. But when it does happen, it's a scenario where the defendant is simultaneously exempt from execution and unable to litigate that that that claim through 2255. And that's the structural defect that Congress did not account for it because Congress couldn't have accounted for that development. Atkins had not been issued yet at the time that AEDPA was was drafted and signed into law. So that's the structural error that we've been discussing here today. And that's the structural error that 2255 prevents someone from from coming in and vindicating their ID claim. Let me ask you the constitutional hypothetical. Suppose Congress looks at the litigation that's been going on in this circuit in the Southern District of Indiana over the last year and says, we need to fix this. And so we want to amend 2255 H1 to allow for these late Atkins claims if the defendant comes forward with clear and convincing evidence such that no reasonable fact finder could disagree. Would that be constitutional? And Your Honor, I think it could be. Depending on the scenario, the requirement of Moore and of Hall is that that Congress can't make or Congress courts, the state legislature can't make procedures that create an unacceptable risk that someone with intellectual disability will be erroneously denied relief and executed. And what is an acceptable risk? I assume it's zero. You are asking the wrong person for that. I know. I don't think there is an acceptable risk. But if that standard in how it's interpreted and applied created an acceptable risk, then clearly it would be unconstitutional. But I ask you one of the questions that the government asked in their red brief, which you know this record way, way better than I do. Did Dr. Crown indicate that his new opinion depended upon the changes that you're telling us were decisive between the different manuals. And Your Honor, he did not. But I don't think the court needs that to make its decision here. And to put it the way we put it in our reply brief, that the only thing that's necessary is reading the record and applying arithmetic. That the experts at 2255 and trial indicated that Mr. Foulkes' IQ score was just a few points too high. And under the diagnostic standards at that time, that was completely consistent. That was okay. And since then, there has been, amongst other things, the emergence of a professional and scientific consensus on the appropriateness of correcting for the Flynn effect, as well as an acknowledgement of the importance of the clinical assessment of intellectual functioning, as opposed to just using an actuarial determination. And so the difference in the diagnostic manuals are clear and the significance is clear. And I don't think it's necessary for Dr. Crown to provide that kind of before and after analysis, because we have provided it in our pleadings, both below in front of the 2241 court and presently. Were any of the six experts consult who testified at trial or 2255 asked whether the new information would have changed their opinions? And no, Your Honor, and I don't think that we have to ask that question because their testimony at trial, and I'm sorry, I'm out of time. May I finish my answer? Yeah, of course. That the testimony at trial and at 2255 was clear that he's right on the cusp. He's a deeply impaired person, but just a few points shy. And the developments in the diagnostic manuals make clear that those few points for someone in Mr. Folks' scenario don't rule out or exclude someone as ID. They render his IQ scores within the ID range and satisfying prong one. And as a result, he satisfies the entire diagnosis. Thank you. OK, very well. Hearing no further questions, the court will take the case under advisement. We do so with renewed apologies to the parties for our glitch at the outset with thanks to both of you for your patience and advocacy here today. And with that, the court will stand in recess. Thank you very much. Thank you.